UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD L. JACKSON,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br><br>Defendant. | Case No. 16-cv-00830-DMR<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 16, 19 |

Plaintiff Richard L. Jackson moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Plaintiff not disabled and therefore denied his application for benefits under Title XVI of the Social Security Act, 42 U.S.C. § 401 et seq. The Commissioner cross-moves to affirm. For the reasons stated below, the court grants in part Plaintiff's motion, denies the Commissioner's motion, and remands this case for further proceedings.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income (SSI) benefits on July 19, 2011, alleging that his disability began on February 1, 2009. Administrative Record ("A.R." 116-125. His application was initially denied on November 4, 2011 and again on reconsideration on July 19, 2012. A.R. 59-62, 64-68. Plaintiff then filed a request for a hearing before an Administrative Law Judge (ALJ). A.R. 69-71.

After the March 17, 2014 hearing, ALJ Nancy Lisewski issued a decision finding Plaintiff not disabled. A.R. 23-36. The Appeals Council denied Plaintiff's request for review on December 18, 2015. A.R. 1-4. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Plaintiff then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.   ADMINISTRATIVE RECORD

### A.  Medical Evidence

Plaintiff has seen a variety of physicians and has been hospitalized numerous times as a result of his medical conditions.  The following is a chronological discussion of the relevant medical evidence.

### 1.  Community Psychiatry Associates, November 2008-April 2009

In November 2008, when Plaintiff was 17 years old, his school referred him to Community Psychiatry Associates for evaluation.  A.R. 211.  Pamela Jones, M.D., performed an intake interview and diagnosed Plaintiff with ADHD.  A.R. 211-216.  She prescribed Concerta and Ritalin and treated Plaintiff through April 2009.  A.R. 217.

### 2.  October 2009 Hospitalization

Plaintiff was hospitalized on a 5150 hold on October 31, 2009 with psychotic symptoms, stating, "I was worried about people hurting me."  A.R. 274.  Dr. Deidre Williams admitted Plaintiff, noting that Plaintiff was concerned that "someone [was] putting steroids, estrogen or some other substance in his body somehow," and had stopped taking his ADHD medications as a result.  A.R. 274.  Plaintiff reported using marijuana two to three times per week, and stated that it was possible "that there may have been other things added to his marijuana."  He denied any other drug use.  Dr. Williams assessed Plaintiff with "new onset psychotic symptoms," noting that it was unclear whether the symptoms were secondary to substance use or "whether they represent a first break psychosis."  A.R. 274.  Dr. Williams diagnosed Plaintiff with psychotic disorder NOS, rule out psychotic disorder secondary to substance, rule out schizophreniform disorder, and rule out brief psychotic disorder.  A.R. 274.  She assessed a Global Assessment of Functioning ("GAF") score of 35.  A.R. 275.

Plaintiff was discharged from the hospital on November 4, 2009.  Dr. Charles Connor examined Plaintiff at discharge.  A.R. 280-281.  He noted that Plaintiff's psychosis "appeared to clear quickly so that by the second hospital day, [he] had a fairly normal mental status exam with resolution of the acute paranoia," a finding Dr. Connor wrote was "most consistent with a probable drug-induced psychosis."  A.R. 281.  He diagnosed Plaintiff with psychosis NOS, "[r]ule

out substance-induced psychosis (cannabis, stimulants) probable diagnosis," rule out schizophreniform disorder. He assessed a GAF score of 60 at discharge. A.R. 281.

### 3. Community Psychiatry Associates, December 2009-January 2010

Between December 2009 and January 2010, Plaintiff received mental health treatment at Community Psychiatry Associates from Dr. Simrita Singh. A.R. 311-321. At his December 4, 2009 appointment, he stated that he had first tried crystal meth in eighth grade, and reported that he had not taken the drug in three weeks. A.R. 316, 318. On that date, Dr. Singh diagnosed Plaintiff with mood disorder NOS, methamphetamine dependence, and marijuana abuse. A.R. 320. She concluded that Plaintiff did not exhibit any psychiatric symptoms warranting treatment and assessed a GAF score of 60.

### 4. December 2009 Hospitalization

Plaintiff was again hospitalized on a 5150 hold on December 23, 2009, expressing suicidal ideation. A.R. 283-297. Dr. Matthew Fitzpatrick performed the intake evaluation and noted that Plaintiff was a poor historian. A.R. 283. There are numerous references in the evaluation and in the hospital records to Plaintiff's recent and ongoing use of marijuana and methamphetamines, and Plaintiff in fact attributed his October 2009 hospitalization to his drug use, and stated that "his recent worsening was due to his drug use." A.R. 283; *see also* A.R. 284, 286, 295. However, Plaintiff's toxicology screen ("U-tox") was clean. When confronted with this fact, Plaintiff was "unable to explain the reasons for his ongoing confusion." A.R. 283; *see also* A.R. 287 (negative results for drug abuse screen). Plaintiff reported fears that his food has been poisoned since his freshman year in high school, and fears that his family had also been poisoning him. He denied having any psychiatric problems, "preferring to believe that it was substance-induced" and became "somewhat upset that his U-tox was negative." A.R. 283. Plaintiff refused any medications. A.R. 283.

Dr. Fitzpatrick diagnosed Plaintiff with psychosis NOS, rule out schizophreniform vs. schizophrenia. He assessed a GAF score of 20. Dr. Fitzpatrick noted his concern that Plaintiff's underlying psychotic disorder was "not primarily due to or exacerbated by substance use." A.R. 284. He also noted Plaintiff was "quite paranoid and refusing meds." A.R. 284.

Plaintiff was discharged six days later, on December 29, 2009.  A.R. 295-296.  Plaintiff had reported improvement after taking Abilify, and also started taking Celexa during his hospitalization.  A.R. 296.  Dr. Fitzpatrick diagnosed Plaintiff with psychosis NOS, rule out schizophreniform disorder, rule out major depression with psychotic features, depression NOS, and marijuana and methamphetamine abuse.  A.R. 295.

### 5.  January 2010 Partial Hospitalization Program

Following his December 2009 hospitalization, Plaintiff was admitted to a day treatment program in psychiatry at Alta Bates Medical Center where he received treatment by Dr. Mark Snavely beginning on January 4, 2010.  A.R. 298-300, 330-338.  The day treatment program consisted of six hours of group, individual, and "milieu" therapies, five days per week.  A.R. 300. At admission, Dr. Snavely noted that Plaintiff reported that he had not taken any medications since his December 29, 2009 discharge.  A.R. 298.  He also denied any illegal drug use since leaving the hospital, but his toxicology screen was "positive for THC only."  A.R. 298, 299.  Plaintiff denied any recent auditory hallucinations and was "quite guarded, evasive and poorly insightful" in his interview with Dr. Snavely.  A.R. 298.  Dr. Snavely diagnosed Plaintiff with psychosis NOS; rule out schizophreniform disorder; rule out substance-induced psychotic disorder; and methamphetamine, cannabis, and alcohol abuse.  He assessed a GAF score of 40.  A.R. 299.

### 6.  Treatment at Alameda County Mental Health Crisis Program, July 2011-August 2011

On July 11, 2011, Plaintiff presented to the Alameda County Mental Health Crisis Program, seeking case management services and complaining of auditory hallucinations, suicidal ideation, "identity/sexuality/religious issues, confusion, disorganization, and depressed mood. A.R. 218.  He participated in five therapy sessions at the program until August 16, 2011.  A.R. 218-229.  April Sanchez-Lerma, LCSW, noted that at his initial appointment he reported that he had gone "to rehab [and] says he has been clean [for] 1 [year]."  A.R. 218.  However, she noted elsewhere that Plaintiff reported "THC use only."  A.R. 221.  Sanchez-Lerma diagnosed Plaintiff with psychosis NOS, cannabis abuse vs. depression, rule out identity disorder, rule out depression NOS, and rule out schizophrenia, paranoid vs. substance-induced.  A.R. 219.  She also assessed a

GAF score of 40.  A.R. 219.  Plaintiff declined medication or a psychiatric evaluation.  A.R. 219.

In subsequent appointments, Plaintiff reported hearing voices in his head.  A.R. 220.  He denied paranoia "except when using THC," and reported getting messages from the television. Sanchez-Lerma noted that Plaintiff "presented [with] disorganization, confusion, tangential possible thought blocking, depression, teary, inappropriate smiling [and] giggling that he couldn't explain."  A.R. 221.  At a July 15, 2011 session, he stated "he was not sure if he was experiencing 'reality or not' and seemed bothered by this."  A.R. 223.  On July 22, 2011, Plaintiff denied visual hallucinations except for "shadows and colors that switch shapes," and admitted to confusion and disorganization.  A.R. 225.  He described the voices he was hearing, saying that he was scared of the voices and unsure if he should listen to them, and stated that "he and the voice have been together a long time."  A.R. 225-226.  Plaintiff's grandfather attended a session with Plaintiff on July 29, 2011 and reported that Plaintiff was up all night and walking to the store in the middle of the night when it was not safe, and that Plaintiff was laughing and talking to himself.  A.R. 227.

### 7.  Examining Physician Dr. Stephen Trichter

Dr. Stephen Trichter performed a mental status examination on October 27, 2011.  A.R. 231-235.  Dr. Trichter noted that Plaintiff's attire and grooming was appropriate, Plaintiff presented in a friendly manner and made good eye contact, and that "[n]o bizarre behavior was observed."  A.R. 231.  Plaintiff reported first experiencing symptoms of depression and psychosis in 2009, but that he was no longer suffering from any symptoms.  A.R. 232.  He denied a history of substance or alcohol abuse or treatment for drugs or alcohol.  A.R. 232-233.  Dr. Trichter found that Plaintiff displayed good judgment and fair insight, and that he had no bizarre or psychotic thought content.  A.R. 233-234.  He concluded that Plaintiff had "no noted mental health impairment" and that his mental health had an "unremarkable" impact on his daily functioning. A.R. 234.  Dr. Trichter opined that Plaintiff has the ability to understand, remember, and carry out simple one or two step job instructions, is able to do detailed and complex instructions, and "[o]verall, [is] not limited in functioning."  A.R. 234.

### 8.  Hospitalizations in November 2011 and December 2011

The record contains evidence that Plaintiff was hospitalized four times in November 2011

and December 2011, with discharge notes dated November 10, 2011, November 17, 2011, November 21, 2011, and December 2, 2011. A.R. 339-347. Discharge notes dated November 21, 2011 and signed by Edward Lim, M.D., listed the reason for admission as follows:

> Jackson's grandmother called because Jackson was showing signs of schizophrenia[.] Jackson said he was hearing voices and that everything was toxic. He would constantly have to spit because he said the stuff in his mouth was poisonous[.] Subject said he could not let go of his grandmother and needed to hold onto her[.] He did not take his medication today[.] He thinks everything is trying to hurt him[.]

A.R. 343. Under a section labeled "Significant Findings," Dr. Lim noted that Plaintiff's thought process was "impoverished," his thought content included "negative ruminations, focused on discharge, confused, suspicious, minimizing behaviors, somatic," with impaired judgment and abnormal psychotic thoughts. A.R. 343. Dr. Lim diagnosed Plaintiff with schizophrenia, paranoid type, and cannabis abuse. At admission, Plaintiff's GAF score was assessed at 20; at discharge it was assessed at 38. A.R. 343.

Discharge notes dated December 2, 2011 and signed by Ruth De Peralta, M.D., state that Plaintiff was non-compliant with his medications and complained of increasing paranoia. A.R. 344. At discharge, she noted that Plaintiff remained "paranoid, delusional" with labile mood. She diagnosed Plaintiff with schizophrenia, paranoid type, and cannabis abuse. At admission, Plaintiff's GAF score was assessed at 35; at discharge it was assessed at 45. A.R. 344.

### 9. Treatment at PREP Program, 2013 and January 2014-April 2014

In 2013 and again from January 2014 through April 2014, Plaintiff received mental health treatment at PREP Alameda County, which is the Prevention and Recovery in Early Psychosis Program. A.R. 349, 351-375. On July 1, 2013, Jennifer Rooney, Psy.D., wrote a letter for Plaintiff explaining that "due to recent stress triggers, [Plaintiff] is experiencing intrusive thoughts and mood fluctuation including depression and agitation . . . [which] put him at risk for a greater mental health relapse." A.R. 349.

Plaintiff eventually left the PREP Program when his symptoms alleviated. A.R. 354. However, asked to be re-admitted in January 2014 after his symptoms recurred and resulted in a period of decompensation. A.R. 374. January 27, 2014 treatment notes state that Plaintiff was

actively hearing voices, had experienced an overall increase in his symptoms, and a decrease in functioning, activities of daily living, and community involvement. A.R. 374. In February 7, 2014 treatment notes, Rachel Pepper, MFT Intern, noted that Plaintiff was currently taking 10mg of Zyprexa three times per day, but that he was "not fully med compliant." A.R. 357. Plaintiff admitted to recent alcohol use, but denied recent use of amphetamines and marijuana and denied past use of amphetamines. A.R. 358-359. In a March 5, 2014 treatment plan, Pepper noted that Plaintiff was experiencing auditory and visual hallucinations 4-5 times per day. A.R. 354; *see also* 362 (Apr. 16, 2014 treatment note indicating hallucinations 4-5 times per day). Throughout his treatment at the PREP Program, case notes indicate that Plaintiff continued to experience auditory and visual hallucinations, anxiety, and difficulty sleeping. *See, e.g.*, A.R. 363, 364, 373.

Pepper assessed Plaintiff's condition in a letter dated April 17, 2014. She stated that Plaintiff had received a schizophrenia diagnosis, and wrote that Plaintiff experiences "auditory hallucinations, and . . . symptoms of alogia, anhedonia, and avolition as well as a degree of cognitive distortion and paranoia which make it difficult, on most days, to interact with others and participate in the activities of daily life." A.R. 351. She opined that due to the severity of his symptoms, "it would be difficult at this time for him to hold a full time job or pursue full time educational g[oals]." A.R. 351.

**B. Plaintiff's Testimony**

Plaintiff provided the following testimony at the March 17, 2014 hearing: Plaintiff was 22 years old on the date of the hearing. A.R. 45. Plaintiff completed high school in 2009 and lives with his mother and younger brother. A.R. 45, 48. Since graduating from high school, Plaintiff has only held part-time jobs. He testified that he had last worked in October 2013 as a universal dock loader, a position he held for only two months. A.R. 46, 48. Plaintiff testified that he is unable to work because he "ha[s] thoughts, sometimes hallucinations, and it seems almost like [he's] hearing voices," so he is "trying to keep [himself] under control, and not do anything to hurt anybody." A.R. 46. Plaintiff denied having any physical problems that would prevent him from working. A.R. 48.

Plaintiff's sole treatment is through the PREP Program, in which he has been participating

United States District Court
Northern District of California

for about two years.  He attends two PREP Program meetings per week.  A.R. 47.  He spends his time attending the PREP Program and walking around a park near his house.  A.R. 49.  Plaintiff denied ever having a problem with drugs or alcohol, and testified that he is clean and sober and only drinks alcohol socially.  A.R. 49.

### C.  The ALJ's Decision

The ALJ performed the five-step disability analysis and found Plaintiff not disabled under Section 1614(a)(3)(A) of the Social Security Act.  A.R. 23-36.  At the second step, the ALJ determined that Plaintiff has the following severe impairments: drug and alcohol abuse and a mood disorder.  A.R. 29.  The ALJ concluded that Plaintiff's impairments met Listings 12.04, affective disorders, and 12.09, substance addiction disorders, of the Listing of Impairments when taking his substance abuse into consideration.  A.R. 29, 32.

The ALJ next determined that in the absence of substance abuse, Plaintiff would continue to have the severe impairment of a mood disorder which would significantly limit his ability to work, but that his impairment would not meet or equal Listing 12.04.  A.R. 32.  The ALJ found that if Plaintiff stopped using substances, he would have no restriction in activities of daily living, and moderate difficulties in social functioning and concentration, persistence, or pace.  A.R. 32-33.  The ALJ wrote

> Consistent with the evidence of a repeated Association between the claimant's drug use and psychotic symptoms with resulting decompensation in his functioning, and the evidence of improvement in his psychotic symptoms following his hospitalizations, I am persuaded that in the absence of substance abuse, the claimant would be able to perform simple, routine, nonpublic work at all exertional levels.

A.R. 34.  Accordingly, she concluded that, absent substance abuse, Plaintiff would have the residual functional capacity ("RFC") "to perform simple, routine, nonpublic work at all exertional levels."  A.R. 33.  Relying on the opinion of a vocational expert (VE) who testified that an individual with such an RFC could perform other jobs existing in the economy, including kitchen helper, hand packager, and assembler, the ALJ concluded that Plaintiff is not disabled.  A.R. 36 ("the claimant would not be disabled if he stopped the substance use").

8

### III.    LEGAL STANDARDS

#### A.  Standard of Review

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a mere scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

#### B.  The Five-Step Sequential Evaluation Process

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him or her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he or she previously performed and incapable of performing any other substantial gainful employment that exists in the

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3. At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4. At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5. At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

**C. Drug Addiction and Alcoholism ("DAA")**

When the record demonstrates that substance abuse has occurred in conjunction with an alleged disability, the ALJ may not find a claimant disabled "if alcoholism or drug addiction would . . . be a contributing factor material to the . . . determination that the individual is

disabled." 42 U.S.C. § 1382c(a)(3)(J); *see* 20 C.F.R. § 416.935(a) & (b). In determining whether a claimant's DAA is material, the test is whether the individual would still be found disabled if he or she stopped using drugs or alcohol. *See* 20 C.F.R. §§ 404.1535(b), 416.935(b); *Parra v. Astrue,* 481 F.3d 742, 746-47 (9th Cir. 2007); *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir. 1998). The ALJ must "evaluate which of [the claimant's] current physical and mental limitations . . . would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). If the ALJ determines that the claimant's remaining limitations are disabling, then the claimant's DAA is not a material contributing factor to the determination of disability, and the claimant is disabled, independent of his or her DAA. *See* 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). The claimant has the burden of showing that he or she would qualify as disabled absent DAA. *See Parra*, 481 F.3d at 748.

Social Security Ruling ("SSR") 13-2p sets forth the procedure for evaluating cases involving DAA, which the ruling defines as "Substance Use Disorders; that is, Substance Dependence or Substance Abuse as defined in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) published by the American Psychiatric Association." SSR 13-2p, 2013 WL 621536, at *3 (S.S.A. Feb. 20, 2013). It instructs adjudicators to "apply the appropriate sequential evaluation process twice. First, apply the sequential process to show how the claimant is disabled. Then, apply the sequential evaluation process a second time to document materiality[.]" *Id*. at *6.

## IV. DISCUSSION

Plaintiff challenges the ALJ's decision on several grounds. He argues that the ALJ erred 1) by failing to include psychotic disorder and schizophrenia among Plaintiff's severe impairments; 2) in weighing the medical opinions; and 3) in assessing Plaintiff's credibility. He also argues that as a result of these errors, the ALJ improperly assessed the materiality of Plaintiff's DAA to his disability, erred in assessing Plaintiff's RFC, and posed an incomplete hypothetical to the VE.

Defendant cross-moves to affirm, arguing that the ALJ's decision is supported by

substantial evidence and is free of legal error.

### A. Evaluation of Plaintiff's Medical Impairments

As noted, Plaintiff argues that the ALJ erred by not including psychotic disorder and schizophrenia in her analysis. He also argues that this error resulted in the ALJ's improper assessment of Plaintiff's RFC.

### 1. Legal Standard

At step two of the five-step sequential evaluation for disability claims, the ALJ must determine whether the claimant has one or more severe impairments that significantly limit a claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii) and (c); 416.920(a)(4)(ii) and (c). A severe impairment is any impairment that has "more than a minimal effect on [the claimant's] ability to do work," *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), and "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 416.921. In addition, when assessing a claimant's RFC, an ALJ must consider all of the claimant's medically determinable impairments, both severe and non-severe. §§ 416.920(e), 416.945; *see Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008); *see also* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments [because] limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.").

### 2. Analysis

The court concludes that the ALJ erred by omitting psychotic disorder and schizophrenia in her analysis. In finding that Plaintiff only had the severe impairments of mood disorder and drug and alcohol abuse, she ignored substantial evidence of Plaintiff's other impairments.

The record shows that Plaintiff's treating physicians and therapists consistently diagnosed him with psychosis/psychotic disorder and/or schizophrenia. Specifically, Drs. Williams, Connor, Fitzpatrick, and Snavely, as well as therapist Sanchez-Lerma, diagnosed Plaintiff with psychosis/psychotic disorder. Drs. Lim and De Peralta and MFT Intern Pepper diagnosed Plaintiff with schizophrenia. A.R. 274, 281, 284, 295, 299, 219 (psychosis/psychotic disorder); 343, 344,

351 (schizophrenia). These disorders resulted in symptoms that would likely have more than a minimal effect on his ability to work, including paranoid delusions, auditory and visual hallucinations, and disorganization. *See, e.g.*, A.R. 220, 223, 225, 227, 274, 283, 298, 343, 344, 351, 354, 363, 364, 373. Further, MFT Intern Pepper, who was Plaintiff's treating therapist, observed that in connection with Plaintiff's schizophrenia, he displays poverty of speech, avolition, cognitive distortion, and paranoia, which make it difficult for Plaintiff to interact with others. A.R. 351.

While the ALJ repeatedly noted these diagnoses throughout her opinion, (*see* A.R. 30, 31, 34), she failed to explain her apparent determination that these impairments would not have more than a minimal effect on Plaintiff's ability to work. Moreover, to the extent that the ALJ determined that Plaintiff's diagnoses of psychosis/psychotic disorder and schizophrenia were *not* severe, she erred in failing to consider their impact when determining Plaintiff's RFC. *See Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) ("the ALJ must consider the 'combined effect' of all the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." (citing 20 C.F.S. § 416.923)). Accordingly, substantial evidence does not support the ALJ's determination of Plaintiff's severe impairments and assessment of Plaintiff's RFC.

### B. Weighing of the Medical Opinions

The ALJ discussed the medical evidence and stated that she gave "great weight to the GAF scores of 35-40 assigned to the claimant when he was hospitalized on a psychiatric basis as those scores reflect decompensation in his functioning following illicit drug use." A.R. 32. She stated that she gave no weight to Dr. Trichter's conclusions, noting that he had not reviewed Plaintiff's hospitalization records at the time of his examination. A.R. 32. She also stated that she gave no weight to MFT Intern Pepper's opinions, stating that "she is not an acceptable medical source and she is clearly advocating on the claimant's behalf and is not an impartial medical provider as she acknowledged that she has assisted the claimant in pursuing his claim" for benefits. A.R. 32, 34.

Plaintiff argues that the ALJ erred by rejecting the opinions of Plaintiff's treating physicians and therapists. Specifically, he argues that the ALJ erred in implicitly rejecting Drs.

13

Fitzpatrick and Snavely's opinions, and portions of the opinions of Drs. Williams, Connor, Lim, and De Peralta. He also argues that the ALJ erred in rejecting the opinions of Sanchez-Lerma and Pepper.

### 1. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of

14

an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

#### i. Plaintiff's Treating Physicians

In the opinion, the ALJ stated that she "ha[d] considered opinion evidence," and that she gave "great weight" to the GAF scores of 35-40 Plaintiff received when he was hospitalized. Although the ALJ did not identify any specific doctors in connection with this finding, she appears to have been referring to Drs. Williams, Snavely, Lim, and De Peralta, who each assigned Plaintiff GAF scores between 35 and 40. *See* A.R. 275, 299, 343, 343. However, while the ALJ gave "great weight" to the GAF score portions of their opinions, she did not discuss other portions of their opinions and did not explain whether she was adopting or rejecting them. Additionally, the ALJ did not discuss Plaintiff's December 2009 hospitalization and Dr. Fitzpatrick's assessment in any detail, merely noting that Plaintiff "had been discharged from the hospital in December 2009 on medication" in connection with her discussion of his partial hospitalization program. A.R. 30. Upon review of the record, the court concludes that the ALJ erred with respect to the opinions of Drs. Fitzpatrick, Williams, Snavely, Lim, and De Peralta.

Dr. Fitzpatrick performed Plaintiff's intake evaluation upon his hospitalization on December 23, 2009. As discussed above, although Dr. Fitzpatrick diagnosed Plaintiff with psychosis NOS, the ALJ did not assess the impacts of this condition, either as a severe or non-severe impairment. Further, Dr. Fitzpatrick stated his opinion that Plaintiff had an underlying

psychotic disorder that was "not primarily due to or exacerbated by substance use." A.R. 284. Dr. Fitzpatrick discussed Plaintiff's negative toxicology screen, stating that Plaintiff "denied that he had any psychiatric problems, preferring to believe that [his condition] was substance-induced." A.R. 283. The ALJ did not acknowledge or discuss Dr. Fitzpatrick's opinions about Plaintiff's diagnosis and the underlying causes. Ignoring portions of a physician's opinion is considered an implicit rejection of those opinions and failure to offer reasons for doing so is legal error. *Smolen*, 80 F.3d at 1286.

While an ALJ is not required to adopt all of an examining physician's assessment, *Magallanes*, 881 F.2d at 753, an ALJ is required to explain the reasons for rejecting those portions of an examining physician's assessment that the ALJ chooses not to adopt. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 n.10 (9th Cir. 2007). When a treating physician's assessment is uncontradicted, the ALJ should provide "clear and convincing" reasons for rejecting that opinion. *See Lester*, 81 F.3d at 830; *see also* 20 C.F.R. § 416.927(d)(2). Here, the decision did not address Dr. Fitzpatrick's opinion, let alone whether his opinion was contradicted or not; however, "[t]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830-31 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995)). Given the requirements governing the treatment of an examining physician's opinions, the ALJ should have made a determination about whether Dr. Fitzpatrick's opinions about Plaintiff's diagnosis and the underlying causes were contradicted or supported by any other doctor. Her failure to do so was legal error.

The ALJ also implicitly rejected portions of the opinions of Drs. Williams, Connor, Lim, and De Peralta without providing the minimum "specific and legitimate reasons." Dr. Williams assessed Plaintiff upon his admission to the hospital on October 31, 2009. The ALJ discussed his hospitalization, noting that at the time of admission, Plaintiff had "admitted to regular marijuana use, 2-3 times per week and also reported alcohol use," and further noting that his "physician also noted evidence of crystal methamphetamine use." A.R. 30. However, the ALJ ignored Dr. Williams's primary diagnosis of psychotic disorder NOS. She also ignored Dr. Williams's

diagnoses of rule out psychotic disorder secondary to substance, rule out schizophreniform disorder, and rule out brief psychotic disorder. *See* A.R. 274. Similarly, Dr. Connor examined Plaintiff at discharge. The ALJ wrote that Plaintiff "was diagnosed with probable diagnosis of substance-induced psychosis, including cannabis and stimulant abuse," but ignored Dr. Connor's definitive diagnosis of psychosis NOS and rule out schizophreniform disorder. A.R. 30, 281. Her failure to provide any reasons to reject these opinions was error.

Drs. Lim and De Peralta treated Plaintiff in connection with two of his four hospitalizations in November 2011 and December 2011. Both diagnosed Plaintiff with schizophrenia, paranoid type, and cannabis abuse. A.R. 343, 344. Notably, in the ALJ's discussion of Plaintiff's condition during that period of time, she inaccurately combined the four hospitalizations into one, even though the record contains discharge notes with four separate dates. *See* A.R. 31 ("[t]hereafter, in December 2011, the claimant was again hospitalized on a 5150 hold after exhibiting increasing paranoia"), 339-347. Although she mentions that Plaintiff was "diagnosed with schizophrenia and cannabis abuse," she appears to have only adopted Drs. Lim and De Peralta's opinions about cannabis abuse, as she does not discuss the separate schizophrenia, paranoid type diagnoses or offer any reasons for rejecting those opinions. The ALJ erred in failing to provide any reasons to reject the opinions by Drs. Lim and De Peralta that Plaintiff has schizophrenia, paranoid type.

### ii. Plaintiff's Therapist

As noted, the ALJ gave no weight to MFT Intern Pepper's opinion that Plaintiff has schizophrenia and her opinions about his limitations. The ALJ rejected her opinions, finding that she was not an acceptable medical source and was "clearly advocating on the claimant's behalf and is not an impartial medical provider as she acknowledged that she has assisted the claimant in pursuing his claim" for benefits. A.R. 32.

A marriage and family therapist is not an "acceptable medical source" and cannot give a medical opinion or be considered a treating source whose opinion may be entitled to controlling weight. *See* SSR 06-03, 2006 WL 2329939, at *2 ("only 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight.").

However, Pepper qualifies as an "other source" who can provide evidence about the severity of Plaintiff's impairments and how they affect his ability to function. *See id.* (listing therapists as "other sources"). "The ALJ may discount testimony from 'other sources' if the ALJ 'gives reasons germane to each witness for doing so.'" *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). Here, other than noting that Pepper was not an acceptable medical source, the sole reason the ALJ gave for rejecting her opinions was the ALJ's conclusion that Pepper was not "impartial" and was "clearly advocating on the claimant's behalf." A.R. 32. It appears the ALJ relied on the following statement in an April 16, 2014 treatment note by Pepper:

> [Therapist] received a call from [client] on this day[.] [Therapist] ascertained that [client] was calling to inquire about his pending SSI application and inquiring about [therapist]'s assistance in this[.] [Therapist] explained that she has received a request from SSI requesting medical records for [client][.] [Therapist] received [client]'s consent to proceed with brokering documentation to SSI, and then did broker these documents for [client]'s case to SSI[.] [Therapist] also informed [client] that she has linked [client] to a pro-bono attorney at Bay Area Legal Aid and that attorney will be notifying [Therapist] of start date of services[.]

A.R. 362. These notes do not support the ALJ's reason for rejecting Pepper's opinions. By the time Pepper began treating Plaintiff, his application for disability benefits was at the hearing stage. Plaintiff initially applied for benefits in July 2011, and the hearing took place on March 17, 2014, before Pepper's notes about "brokering" documentation for the application. Moreover, the fact that Pepper provided her treatment notes and opinion to the SSA is not a basis on which to reject it. As the Ninth Circuit held in *Reddick*, 157 F.3d at 726, "the mere fact that a medical report is provided at the request of counsel, or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report." Pepper's opinions about Plaintiff's diagnosis and limitations were not outliers; by the time she treated him, his diagnoses of psychotic disorder and schizophrenia were well-documented. *See* A.R. 284, 295, 298, 343, 344. The court concludes that the ALJ erred in evaluating Pepper's opinions.[2]

---

[2] Plaintiff also asserts that the ALJ erred by implicitly rejecting Sanchez-Lerma's opinion "that Plaintiff's impairments are not attributable to the effects of substance use." Pl.'s Mot. 14. However, Sanchez-Lerma expressed no such opinion. Instead, she diagnosed Plaintiff with psychosis NOS, cannabis abuse vs. depression, rule out identity disorder, rule out depression

### 3. The ALJ's DAA Determination

The ALJ's errors with respect to the medical source opinions impacted her DAA determination. The relevant inquiry is whether Plaintiff's disabling impairments would remain if Plaintiff stopped his substance use. *See* 20 C.F.R. § 404.1535; *Parra*, 481 F.3d at 745. The Ninth Circuit has recognized the difficulty in evaluating disability cases with concurrent DAA and mental disorders, and distinguished "between substance abuse contributing to the disability and *the disability remaining after the claimant stopped using drugs or alcohol*," noting that "[j]ust because substance abuse contributes to a disability does not mean that when the substance abuse ends, the disability will too." *Sousa*, 143 F.3d at 1245 (emphasis in original). Here, the ALJ concluded that based upon "evidence of a repeated Association between the claimant's drug use and psychotic symptoms with resulting decompensation in his functioning, and the evidence of improvement in his psychotic symptoms following his hospitalizations, [she] [was] persuaded that in the absence of substance abuse, the claimant would be able to perform simple, routine, nonpublic work at all exertional levels." A.R. 34. Defendant asserts that this is sufficient, because the ALJ noted that prior to his October 2009 hospitalization, Plaintiff denied any drug or alcohol use and reported no psychotic symptoms to his psychiatrist, Dr. Jones. Def.'s Mot. 2; *see also* A.R. 33, 212, 214. The court disagrees, because the ALJ did not consider evidence of Plaintiff's multiple diagnoses of psychosis/psychotic disorder and schizophrenia, did not address Dr. Fitzpatrick's opinion that Plaintiff's psychotic disorder was "not primarily due to or exacerbated by substance use," and did not explicitly distinguish between "substance abuse contributing to the disability and the disability remaining after [Plaintiff] stopped using drugs or alcohol." *See Sousa*, 143 F.3d at 1245 (emphasis removed). Accordingly, her DAA finding was not supported by substantial evidence.

### C. Plaintiff's Credibility Assessment

Plaintiff next challenges the ALJ's determination that he was not credible.

### 1. Legal Standard

In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to

---

NOS, and rule out schizophrenia, paranoid vs. substance-induced. A.R. 219.

resolve evidentiary conflicts.  If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld."  *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted).  An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)).  However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so.  *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).  In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints."  *Id*. at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.").  The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis.  20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted).  First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82.  Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms.  *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted).  Absent affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The Ninth Circuit has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's

decision to reject a claimant's testimony. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014).

### 1. Analysis

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that he is alleging disability independent of substance abuse." A.R. 35. She identified four reasons for rejecting Plaintiff's testimony: 1) Plaintiff's poor work history; 2) Plaintiff's mother's statements about his activities of daily living; 3) Plaintiff's conflicting statements about his drug use; and 4) evidence of Plaintiff's non-compliance with prescribed treatment.

The court finds that the reasons offered by the ALJ to discount Plaintiff's credibility were insufficient as a matter of law. As to the first reason, the ALJ noted that Plaintiff had both "a poor work history" and had worked periodically since he applied for benefits, despite his allegations of disabling symptoms, which she found undermined his credibility. This is not a "specific, clear and convincing" reason to reject his testimony. Notably, the ALJ's own reasoning is inconsistent, since she criticized both Plaintiff's lack of work and the fact that he had tried to work after applying for benefits. Further, the fact that Plaintiff attempted to work does not undermine his testimony regarding the severity of his symptoms; to the contrary, his work experiences support his testimony. Plaintiff's mother testified that Plaintiff was placed on leave from his job at Home Depot for two weeks due to an increase in his symptoms, and later resigned at his employer's urging. A.R. 52, 349. He also testified that he worked as a dock loader, and his mother explained that he "was struggling with his symptoms coming back to bother him, and eventually they let him go." A.R. 52.

Next, the ALJ observed that despite Plaintiff's allegations of disabling symptoms, his mother reported that he is able to "do light cooking, laundry and ironing and, in addition, is able to walk to the store to shop," and that he was able to ride the bus to get to the hearing site. A.R. 35. While specific, this reason is not clear and convincing, as it mischaracterizes his mother's statements. While she wrote that he can "wash, iron, and fold and launder his own clothes," she

went on to explain that Plaintiff "has to be constantly reminded to complete tasks," and that she has to "repeatedly go behind him to check his work and come back to finish any tasks that he has begun and walked away from before completing." A.R. 156. Further, the Ninth Circuit has held that a claimant "does not need to be utterly incapacitated in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 1989) (noting that "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.").

Next, the ALJ described Plaintiff's conflicting statements regarding his drug use. She noted that he told Dr. Trichter that he had no history of substance abuse and testified that he had no problems with drugs or alcohol, but told numerous treatment providers that he was using marijuana and crystal methamphetamine. A.R. 35. However, as Plaintiff notes, the record contains many observations by his treating doctors and therapists that he has limited insight into his impairments, poverty of speech, disorganization, and confusion. For example, Dr. Fitzpatrick observed that Plaintiff attributed his October 2009 hospitalization to his drug use, but had a clean toxicology screen. According to Dr. Fitzpatrick, Plaintiff "preferr[ed] to believe that [his condition] was substance-induced and was somewhat upset that his U-tox was negative." A.R. 283; *see also* 218-219 (noting confusion, disorganization), 283 (difficulty organizing his thinking), 313 (disorganized, evasive), 354 (disorganized thinking). In other words, Plaintiff's inconsistent statements about his substance abuse appear consistent with his documented lack of insight into his mental condition and the symptoms of his condition. They are not a clear and convincing reason to discredit his testimony.

Finally, the ALJ noted the evidence in the record of Plaintiff's non-compliance with prescribed treatment, including a failure to take medications as prescribed and failure to appear for mental health appointments. According to the ALJ, "when the claimant is compliant with treatment, there is evidence of amelioration of his psychiatric symptoms." A.R. 35. This too is not a clear and convincing reason to find Plaintiff not credible. As noted, the record contains evidence that Plaintiff suffered from a lack of insight into his mental condition, including denying that he had psychiatric problems, as well as symptoms of delusion and paranoia. A.R. 283, 296,

298, 343.  The Ninth Circuit has stated that "we do not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions."  *Garrison v. Colvin*, 759 F.3d 995, 1018 n.24 (9th Cir. 2014).  Here, the record contains evidence that Plaintiff refused medications on numerous occasions due to his concerns that "someone [was] putting steroids, estrogen or some other substance in his body somehow," and that his family had been poisoning him.  On another occasion he told a physician that he had to constantly spit because the "stuff in his mouth was poisonous."  A.R. 274, 283, 343.  In other words, Plaintiff's non-compliance with his medications is not inconsistent with the symptoms of his mental condition.

In sum, the court concludes that the ALJ erred with respect to assessing Plaintiff's credibility.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted. Defendant's motion for summary judgment is denied.  This matter is remanded for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: September 11, 2017



Donna M. Ryu
United States Magistrate Judge